FILED

FEB 2 2 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEFFREY MCKIE and SUSAN MCKIE,

      Plaintiffs,

                                CV 10-1531-PK

                                FINDINGS AND
v.                             RECOMMENDATION


SEARS PROTECTION CO.; SEARS
ROEBUCK CO.; SEARS HOME
IMPROVEMENT PROCUDTS, INC;
SEARS HOLDINGS CORP.,

      Defendants.

_____

PAPAK, Judge:

      Plaintiffs Jeffrey and Susan McKie ("the McKies") brings this action arising out of the

repair of a furnace protected under an extended service plan sold by defendants (collectively,

"Sears"). The McKies allege common law claims for breach of contract and negligence, as well

as claims under Oregon's Unlawful Trade Practices Act (UTPA), Or. Rev. Stat. § 646.605 *et.*

*seq.* Plaintiff Jeffrey McKie also alleges an elder abuse claim pursuant to Or. Rev. Stat.

Page 1 - FINDINGS AND RECOMMENDATION

§124.110, since he alleges he was 65 years old when he last renewed the service plan.  Now

before the court is defendants' motion to dismiss (#3) pursuant to Fed. R. Civ. P. 12(b)(6).  This

court had removal jurisdiction over the matter under 28 U.S.C. § 1141.  For the reasons discussed

below, the motion should be granted in part and denied in part.

## BACKGROUND

I.    **The Master Protection Agreement**

The McKies allege that approximately 30 years ago they purchased a refrigerator from

Sears, and along with it, a Master Protection Agreement ("MPA").  (Compl., #3, Ex. 1 at ¶9.)

Sears allegedly told the McKies that the MPA would entitle them to "quick, free services and

repair of all covered products by a qualified repair provider, and if necessary, replacement of

those products that could no longer be repaired." *Id.* at ¶10.  Over time, the McKies added other

products to the MPA. *Id.* at 11.  Each time the McKies contacted Sears about repairing an item,

Sears dispatched a Sears technician who repaired or replaced the item. *Id.*  Sears contacted the

McKies every time the MPA was set to expire, encouraging them to renew the plan with

promises of quick, free repairs by qualified technicians. *Id.* at ¶12.  Sears also urged the McKies

to renew the MPA whenever they bought a new product that was eligible for coverage under the

plan, sometimes as often as several times a year. *Id.*  In 1990, the McKies added their home

furnace to the MPA after Sears told them that the MPA could, for the first time, be extended to

cover appliances purchased from vendors other than Sears. *Id.* at ¶¶13-14.  The McKies

continued to renew the MPA when it was set to expire, most recently in August, 2009, when

plaintiff Jeffrey McKie was 65 years old. *Id.* at ¶¶ 16-17.

//

Page 2 - FINDINGS AND RECOMMENDATION

II.    **Furnace Repair**

On December 8, 2009, the McKies called Sears for repair of their furnace, which was having difficulty producing heat. *Id.* at ¶18. At the time, Jeffrey McKie told Sears that he needed to have adequate heat because both he and his wife suffered from ailments exacerbated by the cold. *Id.* at ¶19. Ten days later, on December 18, 2009, a Sears repair technician arrived to examine the furnace, diagnosed the problem as a cracked exhaust condensate housing, and told the McKies that he needed approval from Sears for a replacement part. *Id.* at ¶20. Three weeks later, a different technician who did not wear a Sears uniform or drive a Sears van, came to the McKies' home with a replacement part, but left without installing the part. *Id.* at ¶21. Approximately one week later, on January 18, 2010, a third technician arrived, also apparently unaffiliated with Sears. *Id.* at ¶22. The third technician spent eight hours working on the furnace and installed a new exhaust condensate housing, but left the furnace otherwise unrepaired. *Id.* In the following weeks, both of the McKies suffered from severe headaches. *Id.* at ¶23.

On February 13, 2010, the furnace failed altogether. *Id.* at ¶ 24. A fourth technician, who also had no Sears clothing or vehicle, determined that the furnace had a faulty gas valve. *Id.* The technician stated that a previous technician had cut and left the flue vent open, which allowed exhaust to enter the McKie's dwelling and "probably accounted for the headaches" suffered by the McKies. *Id.* The technician installed the necessary part, but discovered that a switch needed replacing. *Id.* Over a week later, a fifth technician installed a new switch, but the furnace stopped working four hours later. *Id.* at ¶25. That technician returned the next day, determined that the furnace's control panel was defective, and told the McKies that he had received authorization for a new part. *Id.* When the fifth technician did not return the following day, the

McKies called Sears and a service representative told them that a new technician would be sent out. *Id.* at ¶26. During the next five weeks, the McKies repeatedly called Sears to check on the status of their repair and reiterate their need for heat, but no repairs occurred. *Id.* at ¶27. The McKies remained without heat during that time, except for two small space heaters. *Id.*

## III.    Replacement and Negotiations

Finally, on March 25, 2010, more than three and a half months after originally calling Sears for service, the McKies bought and installed a new furnace. *Id.* In the meantime, Sears began to treat the McKie's repair request as a request for replacement, even though the McKies never asked that their furnace be replaced. *Id.* at ¶28. Sears offered to replace the furnace, but told the McKies that they would need to pay $2,237 in advance for parts and labor not covered by the MPA. *Id.* Sears refused to provide the McKie's the brand and model number of the proposed replacement furnace until the McKie's accepted Sears' replacement offer. *Id.* Several weeks later, after a number of additional communications, Sears offered to pay the McKies $3,122 in exchange for a settlement agreement terminating the McKies' rights under the MPA. *Id.* The McKies declined Sears' offer.

On November 15, 2010, the McKies initiated this suit in Multnomah County Circuit Court. (Compl., #3, Ex. 1.) Sears removed the action to this court on December 16, 2010. (Notice of Removal, #1.) Sears' motion to dismiss followed soon thereafter. (#3.)

## LEGAL STANDARD

## I.    Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure

Page 4 - FINDINGS AND RECOMMENDATION

to state a claim, a complaint must contain factual allegations sufficient to "raise a right to relief

above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To

raise a right to relief above the speculative level, "[t]he pleading must contain something more ...

than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of

action." *Id.* (citation omitted). Instead, "for a complaint to survive a motion to dismiss, the non-

conclusory 'factual content,' and reasonable inferences from that content, must be plausibly

suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572

F.3d 962, 970 (9th Cir. 2009), citing *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009).

In ruling on a Rule 12(b)(6) motion to dismiss, a court must take the complaint's

allegations of material fact as true and construe them in the light most favorable to the

nonmoving party. *Keams v. Tempe Tech. Inst.*, 39 F.3d 222, 224 (9th Cir. 1994). Moreover, the

"court may generally consider only allegations contained in the pleadings, exhibits attached to the

complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756,

763 (9th Cir. 2007).

## DISCUSSION

Sears contends the McKies' negligence claim should be dismissed because their

relationship with Sears was contractual, that their UTPA and elder abuse claims should be

dismissed because they fail to plausibly allege that Sears acted with the requisite intent, and that

McKies' allegations concerning misrepresentation need to be plead with more specificity

pursuant to Federal Rule of Civil Procedure 9(b). I agree with Sears only that Mr. McKie's elder

abuse claim is tantamount to a fraud claim under Oregon law and therefore must be plead with

particularity. Since Mr. McKie does not plead the circumstances of the elder abuse claim with

particularity, that claim should be dismissed without prejudice.

## I.     Negligence

Sears argues that the McKies' complaint does not make out a claim for negligence since it only includes allegations concerning Sears' breach of its contractual obligation to repair or replace the McKies' furnace. Sears relies on several Oregon cases, including *Georgetown Realty v. The Home Insurance Company* and *Abraham v. T. Henry Construction, Inc.*, for the notion that the McKies do not properly plead a tort claim because they fail to allege that Sears breached a standard of care arising independent of the parties' contract. The McKies attempt to distinguish *Georgetown Realty* and *Abraham*, cases involving purely economic losses, from this action where they allegedly suffered physical harm in addition to economic loss. Moreover, the McKies argue that even if *Georgetown Realty* and *Abraham* apply, their complaint also includes allegations that Sears breached an independent standard of care by negligently leaving open a flue vent pipe that leaked gas into their home and gave them headaches. Oregon law is unclear, at best, in dictating when a negligence action lies for conduct stemming from a contractual relationship. Nevertheless, under any of the approaches suggested by recent Oregon case law, the McKies' negligence claim is appropriate.

*Georgetown Realty v. The Home Insurance Company* and its progeny comprise the major line of Oregon cases dealing with this subject. In *Georgetown Realty*, plaintiff had an insurance policy with the defendant. *Georgetown Realty v. The Home Ins.*, 831 P.2d 7 (Or. 1992). When a third party filed a tort action against the plaintiff, defendant assumed the plaintiff's defense under the policy. A jury found against the plaintiff in the third-party action and the defendant refused to pay the entire judgment. The plaintiff then brought an action against the defendant alleging

claims for breach of contract and breach of fiduciary duty, seeking compensatory and punitive damages. The jury returned a verdict in favor of the plaintiff on both claims and awarded punitive damages on the claim for breach of fiduciary duty. The defendant appealed, arguing that its duties were "purely contractual," and, therefore, that the trial court erred when it submitted the plaintiff's claim for breach of fiduciary duty to the jury. The Oregon Court of Appeals held the plaintiff did not state a claim for negligence. The Oregon Supreme Court reversed, delivering the following oft-repeated summation concerning the availability of contract and tort claims based on related conduct:

> The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both. *See Ashmun v. Nichols*, 92 Ore. at 234-35, 180 P. 510 (suggesting that a plaintiff might be able to rely on both contract and tort theories).

*Id.* at 12. The Supreme Court determined that the relationship of the defendant insurer to the plaintiff insured carried with it a standard of care independent from the insurance contract. *Id.* at 14. Therefore, the Court concluded that the plaintiff could bring a negligence claim against the defendant. *Id.*

Subsequent cases have clarified types of relationships between contracting parties that can create an independent standard of care as described by *Georgetown*. In *Conway v. Pacific University*, 924 P.2d 818 (Or. 1996), the Oregon Supreme Court explained:

Page 7 - FINDINGS AND RECOMMENDATION

This special responsibility exists in situations in which one party has hired the other in a professional capacity, as well as in principal-agent and other similar relationships. It also exists in the type of situation described in *Georgetown Realty*, in which one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party.

*Id.* at 824. Thus, Oregon courts have recognized special relationships involving lawyers, physicians, engineers or architects, and any professional bound to a higher standard of skill or care. *Id.* at 823. Additional relationships in this category include those between principals and agents, trustees and beneficiaries, and liability insurers who undertake a duty to defend an insured. *Id.* at 824.

In *Abraham*, the Oregon Court of Appeals applied the basic principles described in *Georgetown* and *Conway* to determine whether homeowners could sue their contractors in tort for water damage allegedly caused by negligent construction of their homes. *Abraham v. T. Henry Constr., Inc.*, 217 P.3d 212 (Or. Ct. App. 2009). There, the Court found that there was no special relationship between the homeowners and the contractors they hired to build their homes because plaintiffs provided the specifications for their homes and retained a certain degree of control over the contractor's actions. *Id.* at 216-17. Thus, the contractors' relationship with the homeowners was not the type that created an independent standard of care actionable in negligence.[1]

Plaintiffs point to a second body of Oregon law that purportedly limits the *Georgetown*

---

[1] The Court, however, found questions of fact still existed concerning whether the Oregon Building Code created an independent standard of care supporting plaintiffs' negligence *per se* theory. *Id.* at 218.

analysis only to cases involving purely economic injury. In *Harris v. Suniga*, the Oregon

Supreme Court described that generally, under Oregon common law, "a person whose negligent

conduct unreasonably creates a foreseeable risk of harm to others and causes injury to another

ordinarily is liable in damages for that injury." *Harris v. Suniga*, 180 P.3d 12, 15 (Or. 2008).

The Court explained that Oregon cases have identified an exception to that general rule for

claims involving only economic losses, as opposed to claims for damages for injury to person or

property. *Id.* (citing *Fazzolari v. Portland School Dist. No. 1J*, 734 P.2d 1326, 1330 (1987)).

That exception, the so-called "economic loss doctrine," holds that a plaintiff cannot recover in

negligence for purely economic loss without demonstrating that a special relationship exists

between the parties imposing a duty beyond the common-law negligence standard.[2] *Id.* at 15–16

(citing *Hale v. Groce*, 744 P.2d 1289, 1290 (1987)).

    The Court's analysis in *Harris* further illustrated the distinction between claims for purely

economic losses and claims for physical damages. There, subsequent purchasers of an apartment

building sued the contractor who originally constructed the building, alleging that the

contractor's negligence caused dry rot.[3] *Id.* at 17. The Court held that the apartment purchasers

sought recovery for "physical damage to their real property," not purely economic loss. *Id.*

Therefore, the purchasers' negligence claim was not barred by the economic loss doctrine. *Id.* at

18.

---

    [2] Although Oregon courts first used the specific term "economic losses" in *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896, n.6 (Or. 1992), the substance of the economic loss doctrine dates back at least to *Snow v. West*, 440 P.2d 864 (Or. 1968).

    [3] The purchasers, however, did not base their claim on a special relationship, status, or contract with defendants, since they acquired the building after construction was finished. *Id.* at 16.

Plaintiffs suggest that in cases which involve some aspect of physical injury, the analysis described in *Georgetown Realty* is inapplicable. However, I note a fairly recent Oregon case applying the *Georgetown* framework even where the plaintiff alleges physical injury. In *Strader v. Grange Mut. Ins. Co.*, 39 P.3d 903(Or. Ct. App. 2002), plaintiffs sued their insurer for breach of contract, alleging that the insurer failed to pay compensation sufficient to repair water damage to their roof. *Id.* at 905. Plaintiffs also brought a tort claim, alleging that the insurer negligently permitted mold to grow in the roof, which caused personal injury to one of the plaintiffs. *Id.* The trial court granted summary judgment on the personal injury claim, and the Court of Appeals affirmed. *Id.* at 904. There, the Court observed that the allegedly tortious conduct– failure to pay for the roof repairs– was "precisely the same conduct that [plaintiffs] identify as the breach of contract" and, therefore, the standard from *Georgetown* applied. *Id.* at 905-906 ("plaintiffs alleged that defendant's delayed payment and nonpayment were breaches of the insurance contract and also violations of independent standards of care, thus squarely putting this claim within the ambit of *Georgetown Realty* and subsequent cases.")

The Court then summarized the pleading standard from *Georgetown* as follows:

> [T]o bring a tort claim based on conduct that is also breach of a contract, a plaintiff must allege, first, that the defendant's conduct violated some standard of care that is not part of the defendant's explicit or implied contractual obligations; and, second, that the independent standard of care stems from a particular special relationship between the parties.

*Id.* at 906. Although the plaintiffs and defendant were "insured and insurer", the Court found that their relationship was not a "special fiduciary-like relationship" as in *Georgetown. Id.* at 906. The insurer was not dedicated to furthering the plaintiffs' interests, had no mandate to exercise independent judgment for the sole benefit of the plaintiffs, and did not have full

authority to determine for plaintiffs how much they should receive as compensation. *Id.*
Accordingly, the Court found that there was no standard of care arising independent of the
contract terms that could support a negligence claim. *Id.*

*Strader*, it seems, constitutes a third approach to cases where physical injury results from
conduct by a party in a contractual relationship with the plaintiff. By applying the *Georgetown*
framework only when the alleged tortious activity is "precisely the same conduct" that constituted
the breach of contract, *Strader* suggests that a court should focus on the factual allegations of
negligent conduct to determine whether they are indeed distinct from the allegations constituting
breach of contract. Moreover, *Strader* suggests that the presence of physical injury does not
preclude application of the *Georgetown* framework.

Following any of the three different approaches taken by Oregon courts, I reach similar
results. First, applying the *Strader* analysis, I find that at least some of the negligent conduct
alleged by the McKies' properly states a negligence claim. Here, unlike in *Strader*, plaintiffs'
contract and tort claims are not based on "precisely the same conduct." The McKies' contract
claim rests on one allegation: that "Sears failed to timely repair and/or replace the McKies's
furnace, which was covered by the MPA." (Compl, #3, Ex. 1 at ¶51.) By contrast, the McKies
allege two separate bases for their negligence claim: (1) that Sears' failure to "timely respond to
the McKies' situation and meet their service obligations under the MPA," which caused the
McKies to experience pain from aggravation of their arthritic and diabetic symptoms; and (2) that
Sears' negligence in "leaving open a flue vent pipe during a repair visit while leaving the furnace
unrepaired," which exposed the McKies to furnace exhaust for a month. *Id.* at ¶¶43, 45. While
the first of these allegations describes precisely the same conduct that the McKies identify as a

breach of contract– leaving the heater unrepaired for an extended period– the second allegations is different, involving a technician's attempted repair that pumped exhaust gas into the McKies' home. Thus, the threshold test implied by *Strader* is not satisfied in this case. Accordingly, the McKies should not be prevented from bringing a negligence claim regarding Sears' conduct in leaving the furnace flue pipe open.

Next, adhering to *Georgetown Realty*, the same result obtains. Plaintiffs must first allege that the defendant's conduct violated some standard of care that is not part of the defendant's contractual obligations. Here, the flue vent allegation describes an act by a Sears technician which arguably violated the professional standard of care due by a furnace repair technician to the owners of the furnace to avoid exposing them to hazards from botched repairs, such as harmful furnace exhaust. This ordinary standard of care is distinct from the standard of care allegedly specified within the MPA– quick, hassle-free repair service– which makes no promises concerning the level of safety, skill, or professionalism to be exhibited by Sears technicians. Plaintiffs next must allege a special relationship between the parties creating the independent standard of care. Again, it is reasonable to infer from the McKies' allegations that Sears and the McKies were in a special relationship, such that the McKies authorized Sears and their technicians to exercise independent judgment on their behalf in repairing all their covered appliances, including their furnace. (*See, e.g.*, Compl., #3, Ex. 1 at ¶¶12-13) (McKies told by Sears that the MPA would provide quick, easy, hassle-free repairs). Consequently, the McKies' complaint satisfies the *Georgetown* pleading requirement.

Finally, to the extent that *Harris* even applies to this case, it also supports the availability of a negligence claim. Both parties agree that the McKies allege physical injuries. Therefore,

Page 12 - FINDINGS AND RECOMMENDATION

according to *Harris*, the economic loss doctrine does not govern and the *Georgetown* analysis is unnecessary. Consequently, the McKies' negligence claim would proceed under the general approach to negligence actions.

Despite the proliferation of complex doctrinal analysis followed by Oregon courts, the general underlying principal here remains relatively simple. In alleging that the Sears' technician injured them by cutting a gas exhaust flue in the course of a repair, the McKies' effectively assert that one of Sears' employees committed an *independent* act of negligence that went *beyond* even Sears' allegedly negligent breach of contractual duties to repair the furnace in a timely manner. Thus, while the portion of plaintiffs' negligence claim concerning Sears' delayed response in repairing the furnace should be dismissed, (Compl., ¶¶41-42), the remaining allegation concerning the Sears repair technician leaving an exhaust flue open, (Compl., ¶¶43-44), should survive.

## II.    UTPA and Elder Abuse Claims

Sears contends that both the UTPA and elder abuse claims fail because they do not allege sufficient facts to satisfy the *Twombly* and *Iqbal* pleading standard concerning the willfulness element of a UTPA claim and the wrongfulness element of the elder abuse claim. I generally agree with Sears that the facts contained in a complaint and the reasonable inferences from those facts must "plausibly" suggest the McKies are entitled to relief. *Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), (citing *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009)). Nevertheless, I take a different view of the relevant substantive pleading requirements for these statutory claims and of the plausibility of their success given the McKies' factual allegations.

A.    **UTPA**

The McKies' complaint alleges that Sears violated the Oregon Unfair Trade Practices Act

by "selling the MPA and subsequent renewals of the MPA to the McKies under false pretenses,"

namely, misrepresenting that the MPA would provide timely, free repairs and failing to disclose

that the repair technicians would not be certified by Sears. (Compl., ¶¶34-36.) According to

Sears, *Rathgeber v. Hemenway*, 69 P.3d 710,715 (Or. 2003) requires that the McKies allege

willfulness such that Sears knew or should have known that its representations regarding the

MPA were untrue *at the time Sears made those representations*. Sears explains, however, that

such an allegation cannot be reasonably inferred from the McKies' complaint, since the

complaint acknowledges that Sears provided 30 years of excellent service under the MPA and

includes no allegations suggesting that Sears intended to do otherwise when it convinced the

McKies' to renew in August 2009. (Compl., ¶11.)

The McKies, however, take issue with Sears' interpretation of the pleading standard for

UTPA claims. They argue that *Rathgeber* examines the standard for proving willfulness at trial,

not for pleading willfulness in a complaint, and is thus inapplicable. Further, they contend that

*Rathbeger* actually defines the willfulness proof requirement more leniently, permitting a

plaintiff to demonstrate willfulness in some circumstances by showing a single instance of

misconduct from which a jury could infer that a defendant did not intend to comply with her

promises.[4] *Rathgeber*, 69 P.3d at 715. In any case, the McKies assert that they properly plead

the willfulness element by alleging that "Defendants' violations of the UTPA were willful in that

---

[4] The McKies also note that the *Rathgeber* court found plaintiff presented insufficient
evidence of willfulness specifically because the plaintiffs conceded that fact. *Rathgeber*, 69 P.3d
at 715-16. The McKies, unlike the plaintiffs in *Rathgeber*, make no such concession.

Defendants knew or should have known that their representations and nondisclosures regarding the services provided under the MPA were false and misleading and violated the UTPA." (Compl., #3, Ex. 1 at ¶36).

For a private party to recover damages for a UTPA violation, she must plead and prove a "willful" violation of the statute by the defendant. Or. Rev. Stat. § 646.638(1) ("Any person who suffers any ascertainable loss of money or property, real or personal, as a result of *willful* use or employment by another person of a method, act or practice declared unlawful by ORS 646.608 or 646.648, may bring an individual action in an appropriate court to recover actual damages or $ 200, whichever is greater."); *Rathgeber*, 69 P.3d at 715. "A willful violation occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." Or. Rev. Stat. § 646.605(10).

In *Rathgeber*, the Oregon Supreme Court clarified that statements do not violate the UTPA unless they constitute willful misrepresentations "at the time that they were made . . . ." *Id.* at 715. There, plaintiffs alleged that their real estate agent violated the UTPA by willfully misrepresenting to them, through statements and a disclosure form presented when he agreed to act as their agent, that his services had "qualities of competence and diligence" which they did not actually have. *Id.* at 713. At trial, plaintiffs presented evidence that the agent breached his fiduciary duty by failing to provide competent and diligent services, but they acknowledged that the agent was simply careless, not dishonest or intentionally misleading. *Id.* at 715, 716 n.6. The trial court denied defendant's motion for a directed verdict on plaintiffs' UTPA claim and the jury returned a verdict for plaintiffs. *Id.* at 712. The Court of Appeals reversed the judgment on the UTPA violation and the Supreme Court affirmed, holding that the plaintiffs' evidence and

Page 15 - FINDINGS AND RECOMMENDATION

reasonable inferences drawn from it could not permit the jury to find facts establishing the

willfulness element of plaintiffs' UTPA claim. *Id.* at 714, 716. Specifically, because plaintiffs

acknowledged that the "the misconduct here would not support the conclusion that [the agent]

*knew or should have known* that he would breach his fiduciary duty *at the time of the*

*representations* alleged in this case," the plaintiffs were not entitled to have their UTPA claim

considered by the jury. *Id.* at 716 (emphasis in original). The Court, however, left open the

possibility that evidence of willfulness at the time of the representation can be *inferred* from the

severity of a defendants' later misconduct.[5]

I agree with plaintiffs that the *Rathgeber* decision squarely addresses the proof

requirement for willfulness, not the pleading requirement. Nevertheless, pleading and proof

requirements are obviously interrelated, since a claim is properly plead only when it plausibly

suggests that plaintiff could prove her allegations at trial. Consequently, *Rathgeber* also provides

guidance on the pleading standard for a UTPA claim. To survive a motion to dismiss, plaintiffs'

UTPA factual allegations must somehow suggest the defendant acted willfully at the time of the

misrepresentation, perhaps by alleging misconduct so inconsistent with the defendant's original

promise that the court could reasonably infer the defendant did not intend to comply with her

---

[5] The Court stated:

> Amicus State of Oregon argues that the evidence of defendants' breach of
> fiduciary duty shows conduct so far out of compliance with that duty that the jury
> could infer that, at the time that Zobel represented that he would act as plaintiffs'
> buyer's agent and would provide the attendant quality of services, he did not
> intend to provide services of that quality. The state further argues that a single act
> of misconduct can be sufficient to support the finding of a UTPA violation. *We*
> *agree that a single act of misconduct, in certain circumstances, can be sufficient*
> *to support a finding that an actor did not intend to act in compliance with a*
> *promise made.*

*Id.* at 715 (emphasis added).

Page 16 - FINDINGS AND RECOMMENDATION

promises at the time they were made. *Cf. Rathgerber*, 69 P.3d at 715.

Here, the McKies properly plead their UTPA as envisioned by the *Rathgerber* decision. Although their conclusory allegations of willfulness do not suffice, the McKies' factual allegations concerning the severity of Sears' misconduct plausibly raise the inference that Sears willfully misrepresented the nature of the MPA at the 2009 renewal. Sears allegedly failed to repair a furnace, despite sending five different repair technicians to the home over the course of more than three and a half months, and in the process left two individuals with health problems in a home without adequate heat. Moreover, after effectively abandoning the repair, Sears allegedly attempted to convince the McKies to pay several thousand dollars out of pocket for an unspecified furnace replacement. Sears' alleged conduct deviates so drastically from Sears' alleged promises of MPA benefits that the allegations, if proven, could allow a jury to infer willfulness at the time of the 2009 renewal.

Defendants maintain that such an allegation is entirely implausible, since it would imply that Sears, after providing 30 years of stellar MPA benefits, suddenly decided to institute poor service and then misrepresent the nature of that service to the McKies. But, it is certainly plausible that Sears changed the way it administered the MPA between the McKies' penultimate contact and their 2009-2010 encounter, possibly subcontracting repairs to non-Sears technicians who provide inferior service.[6] *See Iqbal*, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing

---

[6] In fact, the McKies' complaint suggests that Sears no longer exclusively sent their own certified repair technicians, as they did in earlier years. (Compl., #3, Ex. 1 at ¶¶11,21-25) (previous repair calls answered by Sears repair technicians, but only the first of five technicians sent to repair the McKies' furnace wore a Sears uniform and drove a Sears truck).

Page 17 - FINDINGS AND RECOMMENDATION

court to draw on its *judicial experience and common sense*.") (emphasis added). It is equally
plausible that the Sears representative who spoke with the McKies in August 2009 either knew or
should have known that the repair work provided under the MPA would not live up to the
standard they allegedly described. Accordingly, the McKies' UTPA claim should not be
dismissed for failure to allege a willful UTPA violation.

### III.     Elder Abuse

Sears argues that Jeffrey McKie's elder abuse is deficient in much the same way as the
McKies' UTPA claim. Sears notes that the relevant elder abuse statute, Or. Rev. Stat. §
124.110(a), prohibits "wrongful" taking of money, which Oregon courts define as a taking of
money "in pursuit of an improper motive or by improper means." *Church v. Woods*, 77 P.3d
1150, 1153 (Or. Ct. App. 2003). The complaint fails to plausibly allege that Sears had an
improper motive or used improper means, Sears argues, because McKie does not allege that
Sears knew of should have known that it was misrepresenting the features of the MPA to the
McKies at the time of their August 2009 renewal. Jeffrey McKie however, notes that case law
explicitly includes "misrepresentation" as one example of improper means. *See Church*, 77 P.3d
at 1153. Therefore, he argues that his allegation that Sears misrepresented the MPA's services
amounts to an allegation of improper means, which constitutes "wrongful" conduct under Or.
Rev. Stat. § 124.110(a).

A claim for financial elder abuse under Or. Rev. Stat. § 124.110(a) has four elements:
"(1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or
incapacitated person, and (4) the taking must be wrongful." *Church*, 77 P.3d at 1153.
Concerning the fourth element, conduct is "wrongful" if it is "carried out in pursuit of an

improper motive or by improper means." *Id.* Improper means, in turn, "must be independently wrongful by reason of statutory or common law, beyond the mere fact of the injury complained of" and includes "violence, threats, intimidation, deceit, *misrepresentation*, bribery, unfounded litigation, defamation and disparaging falsehood." *Id.* (emphasis added). Misrepresentation, as defined elsewhere in Oregon statutes, requires some form of knowing deception. *See* Or. Rev. Stat. § 687.011 ("'Fraud or misrepresentation' means knowingly giving misinformation or a false impression through the intentional misstatement of, concealment of or failure to make known a material fact or by other means.")

Here, Jeffrey McKie's complaint does not *directly* allege facts, which, if true, show that Sears misrepresented the nature of Sears' repair services under the MPA. But, as with the McKies' UTPA claim, the nature of Sears' alleged conduct plausibly suggests that Sears knew that the MPA would not provide quick, hassle-free repairs at the time of the 2009 renewal. There exists no Oregon case law interpreting the elder abuse statute to suggest a court can infer wrongfulness from the severity of later misconduct, as *Rathgeber* does in the context of UTPA claims.[7] Nevertheless, I apply that principle to the McKies' elder abuse claim, since the court may draw reasonable inferences from the complaint's factual allegations. Thus, the complaint's allegations, if true, plausibly suggest that Sears misrepresented the nature of the MPA in its 2009 communications.

## IV.    Fed. R. Civ. P. 9(b)

Finally, Sears argues that even if this court does not dismiss the UTPA and elder abuse claims, it should require the McKies to plead those claims with particularity, as required by Fed.

---

[7] In fact, few Oregon cases of any kind address the elder abuse statute.

Page 19 - FINDINGS AND RECOMMENDATION

R. Civ. P. 9(b). No federal case directly addresses whether UTPA or Oregon elder abuse claims amount to fraud allegations required to be plead with particularity under Rule 9(b).[8]

Rule 9(b)'s particularity requirement applies to state law causes of action. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). A state law statutory cause of action plead in federal court must satisfy Rule 9(b) when fraud is a "necessary element" of the claim under that statute or when the claim is "grounded in fraud" because it relies exclusively on a "unified course of fraudulent conduct." *Id.* at 1103. Moreover, even if the entire claim is not grounded in fraud, individual allegations "based on fraud" within the claim must satisfy Rule 9(b). *Id.* at 1105. In order to determine whether a particular claim or allegation is tantamount to fraud, the Ninth Circuit refers to the elements of a state common law fraud claim. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).

## A.    UTPA

Neither of the McKies' two UTPA allegations are based on fraud, and thus neither are required to comply with Rule 9(b). The McKies' UTPA claim alleges that Sears willfully violated the UPTA in two respects: (1) by falsely stating that the MPA would provide timely, free repairs/replacements; and (2) by failing to disclose that it would send unqualified or uncertified technicians, or require lengthy delays between service calls or communications with Sears. (Compl. at ¶¶34-35.) The first allegation amounts to affirmative representation, while the second

---

[8] I find one case, however, where a federal court *implies* that UTPA claims must be plead with particularity. *See Phillips v. Lithia Motors, Inc.*, No. 03-3109-HO, 2006 U.S. Dist. LEXIS 25607, at *44-45 (D. Or. Apr. 27, 2006) (apparently treating common law fraud and UTPA claims similarly in requiring pleading with particularity, although not providing any analysis for doing so and not explicitly relying on that similarity in reaching its conclusion).

describes misrepresentation by non-disclosure.

In *Oregon ex rel. Redden v. Disc. Fabrics, Inc.*, 615 P.2d 1034 (Or. 1980), the Oregon

Supreme Court performed a general comparison between the elements of UTPA claims and

common law fraud claims, noting two important differences. *Id.* at 1038 (quoting *Wolverton v.

Stanwood*, 565 P.2d 755, 757 (Or. 1977)) ("[t]he elements of common law fraud are distinct and

separate from the elements of a cause of action under the Unlawful Trade Practices Act, and a

violation of the Act is much more easily shown.") (internal quotations omitted). First, the Court

observed that, unlike fraud claims, UTPA claims based on non-disclosure in particular do not

require proof of reliance. *Redden*, 615 P.2d at 1039 (citing *Sanders v. Francis*, 561 P.2d 1003,

1006 (1977)). Second, the Court found that the scienter requirement for all UTPA claims was

different than for common law fraud claims: where UTPA claims require only negligent

misrepresentation, fraud claims require something more.[9]

Sears resists accepting this clear holding of the Oregon Supreme Court for several

reasons, none of which are persuasive. First, Sears argues that since *Redden* involved a UTPA

suit for civil penalties, its holding concerning scienter is not applicable to UTPA suits for private

damages, like the current action. The *Redden* decision, however, interpreted the statutory term

---

[9] There, the Court analyzed the term "wilful," as defined in the UTPA, and found that it "requires no more than proof of ordinary negligence by a defendant in not knowing, when it should have known, that a representation made by him was not true." *Id.* Thus, the Court concluded that under the terms of the UTPA, "a defendant is liable for misrepresentations made negligently, without evidence that it was attended by either conscious ignorance or reckless indifference to its truth or falsity, whereas evidence that a misrepresentation was made negligently is insufficient in an action for common law fraud." *Id.*

"wilful,"[10] which provided the scienter requirement for all types of UTPA suits, not just actions for civil penalties.[11] Second, Sears suggests that *Rathgeber*, discussed above, establishes a different and higher level of scienter for private damages suits under the UTPA. *Rathgeber* is consistent with *Redden*, however, and confirms that "willful" describes the required mental state for private damages actions. *See Rathgeber*, 69 P.3d at 715.

In light of the differences between the elements of common law fraud and UTPA claims, the McKies' UTPA claim cannot be considered tantamount to a fraud claim. The scienter for both UTPA allegations differs from the scienter requirement for fraud. Further, reliance is not a required element of the McKies' UTPA non-disclosure allegation, while reliance is required for fraud claims. Consequently, the McKies' UTPA claim need not meet the pleading requirements of Rule 9(b).

**B.      Elder Abuse**

The factual allegations of Mr. McKie's Elder Abuse claim resemble those advanced in support of the McKies' UTPA claim, except that they omit any reference to non-disclosure:

---

[10] Note that the spelling of this statutory term varies. The version of the statute interpreted in *Redden* uses the spelling "wilful," while the current statute uses the spelling "willful." Both spellings appear to be accurate, although "wilful" is favored by British sources such as the Oxford English Dictionary.

[11] At the time of the *Redden* decision, "wilful" was the scienter requirement for private damages actions under the UTPA. *Redden*, 615 P.2d at 1309 (observing that Or. Rev. Stat. § 646.638(1) "requires that a *private party* has suffered an ascertainable loss 'as a result of *wilful* use or employment by another person of a method or practice declared unlawful by ORS 646.608 . . .,' before such party may bring a UTPA suit.") (emphasis added). Currently, willfulness remains the mental state required for private damages suits. *See* Or. Rev. Stat. § 646.638 ("Civil action by private party . . . (1) . . . any person who suffers any ascertainable loss of money or property, real or personal, as a result of *willful* use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action. . .").

"Sears sold the 2009 MPA renewal to Mr. McKie by misrepresenting that it would provide the McKies with timely, cost-free repair and/or replacement of their covered products . . . Sears wrongfully took Mr. KcKie's money . . . ." (Compl., ¶55). As I described above, a claim for financial elder abuse under Or. Rev. Stat. § 124.110(a) requires, among other things, an allegation of  wrongfulness, which may be satisfied by an allegation of improper means through misrepresentation. Unlike with the UTPA, the Oregon Supreme Court has not analyzed whether an elder abuse claim based on misrepresentation is analogous to a common law fraud claim. Lacking that guidance, I look to Mr. McKie's elder abuse allegations, which appear to allege "a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim." *Vess*, 317 F.3d at 1103. Thus, Mr. McKie's elder abuse claim can be characterized as a claim "grounded in fraud," in the parlance of the Ninth Circuit. Consequently, Rule 9(b) applies to that claim. Since Mr. McKie does not allege the circumstances of Sears' fraudulent conduct with particularity, the claim should be dismissed without prejudice. *See* Fed. R. Civ. P. 9(b); *Vess,* 317 F.3d at 1106 (Rule 9(b) requires pleading the  "the who, what, when, where, and how" of the misconduct alleged). Mr. McKie should be granted leave to amend his complaint and allege such facts as: the content of the representation made to him by Sears, the time at which he became a member of the protected class, and the time at which he paid Sears to renew the MPA.

## V.    Limitation of Damages for Elder Abuse Claim

Finally, Sears argues that to the extent Mr. McKie states an elder abuse claim, he may only recover the amount of money Sears allegedly received in exchange for the MPA, but may not recover the cost of a replacement furnace or damages for physical pain and suffering, since his claim is for financial abuse. I disagree.

Page 23 - FINDINGS AND RECOMMENDATION

Oregon's elder abuse statute does not draw a distinction between physical and financial abuse claims in terms of available damages. Or. Rev. Stat. § 124.105 describes "Physical abuse subject to action" while Or. Rev. Stat. § 124.110 describes "Financial abuse subject to action." Mr. McKie brings his claim under the latter provision. *See* Or. Rev. Stat. § 124.110(1)(a) (wrongful taking of money from a vulnerable person). The definition section of the statute explains the available actions and damages as follows:

> (2) A vulnerable person who suffers injury, damage or death by reason of *physical abuse or financial abuse* may bring an action against any person who has caused the physical or financial abuse or who has permitted another person to engage in physical or financial abuse. The court shall award the following to a plaintiff who prevails in an action under this section:
>
> > (a) An amount equal to three times all *economic damages*, as defined in ORS 31.710, resulting from the physical or financial abuse, or $ 500, whichever amount is greater.
> >
> > (b) An amount equal to three times all *noneconomic damages*, as defined by ORS 31.710, resulting from the physical or financial abuse.

Or. Rev. Stat. § 124.100 (emphasis added).  Thus, the language of the statute clearly permits non-economic damages in actions based on financial abuse.  Non-economic damages include "subjective, nonmonetary losses, including but not limited to *pain, mental suffering, emotional distress*, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment." Or. Rev. Stat. § 31.710(2)(b).  Consequently, Mr. McKie may pursue recovery for physical pain and suffering.

Whether Mr. McKie also may recover the cost of a replacement furnace is a question of fact, not a matter of law to be determined on a motion to dismiss. As the statute describes,

McKie may recover economic damages. *See* Or. Rev. Stat. § 124.100(2)(a). Such damages are:

> objectively verifiable monetary losses including but not limited to reasonable charges
> necessarily incurred for medical, hospital, nursing and rehabilitative services and other
> health care services, burial and memorial expenses, loss of income and past and future
> impairment of earning capacity, reasonable and necessary expenses incurred for substitute
> domestic services, recurring loss to an estate, damage to reputation that is economically
> verifiable, reasonable and *necessarily incurred costs due to loss of use of property and
> reasonable costs incurred for repair or for replacement of damaged property*, whichever
> is less.

*Id.* (emphasis added). Here, McKie could theoretically recover any costs due to the loss of use or

replacement of his furnace, so long as they are "necessarily incurred." Sears perhaps believes

that since Mr. McKie's furnace was functioning poorly before its repair technicians first worked

on it, replacement of the furnace was not "necessarily incurred" as a result of Sears' alleged

financial abuse. (D.'s Reply, #10, at 10) (arguing that "nothing Sears said or did cause Mr.

McKie to incur the cost of a new furnace."). However, the McKies' allege that although the

furnace had difficulty producing adequate heat before it was serviced, the furnace "stopped

working altogether" sometime after the third service call. (Compl., ¶24.) Thus, whether Sears'

repairs exacerbated the problems with the furnace and whether that additional damage led to the

furnace's complete failure are factual disputes. At this juncture, Sears is not entitled to a ruling

that the elder abuse statute limits Mr. McKie's damages to the cost of the MPA renewal.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (#3) should granted in part and

denied in part. The portion of plaintiffs' negligence claim concerning Sears' delayed response in

repairing the furnace should be dismissed, (Compl., ¶¶41-42), while the remaining allegation

concerning the Sears repair technician cutting and leaving an exhaust flue open, (Compl., ¶¶43-

44), should survive.  Further, Mr. McKie's elder abuse claim should be dismissed without prejudice for failure to comply with Fed. R. Civ. P. 9(b) and Mr. McKie should be granted leave to amend his complaint to plead the circumstances of his elder abuse claim with particularity.

### SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 22nd day of February, 2011.

Honorable Paul Papak
United States Magistrate Judge